FILED

2006 Dec-12  PM 01:54
U.S. DISTRICT COURT
N.D. OF ALABAMA

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| EDWARD T. KELLEY, | ] | |
| | ] | |
| Plaintiff, | ] | |
| | ] | |
| v. | ] | CV-05-BE-1131-S |
| | ] | |
| PEMCO AEROPLEX, INC., | ] | |
| | ] | |
| Defendant. | ] | |
| | ] | |
| | ] | |

## MEMORANDUM OPINION

### I. INTRODUCTION

This case is currently pending before the court on a motion for summary judgment (doc. #

12), supporting brief (doc. # 23), and evidentiary materials (doc. # 14) filed by defendant Pemco

Aeroplex Inc.  Plaintiff Edward Kelley filed an objection to the motion for summary judgment with

corresponding evidentiary submissions (doc. #21 & # 23).  On June 5, 2006, the court held a

hearing on the defendant's motion for summary judgment.  After hearing the parties' arguments

and citations of authority, the court reserved ruling on the motion for summary judgment,

permitting the parties to file supplemental briefs on the validity of the Last Chance Agreement

(LCA) at issue in this case and the appropriate construction of the amended complaint.  *See* doc. #

30 & and doc. # 31.

Having reviewed the parties' submissions and considered the arguments advanced by the

parties at oral argument, the court concludes that the defendant's motion for summary judgment is

due to be GRANTED in part and DENIED in part.

For the reasons discussed in the text of this opinion, the court finds that the LCA bars any

1

claims related to the plaintiff's first termination.  Consequently, the motion for summary judgment is due to be GRANTED on Counts I & II for any Family & Medical Leave Act (FMLA) and Americans with Disabilities Act (ADA) claims related to the plaintiff's first termination.  The court also specifically finds that the defendant's motion for summary judgment on Count I of the amended complaint is due to be GRANTED as to any FMLA interference claims related to his second termination.  However, the motion for summary judgment on the plaintiff's FMLA retaliation claim related to his second termination is due to be DENIED.

The defendant's motion for summary judgment on Count II, alleging an underlying violation of the ADA and a violation of the ADA's anti-retaliation provisions, relating to his second termination is due to be DENIED.  Lastly, the motion for summary judgment on Count III of the amended complaint alleging breach of contract in relation to his second termination is due to be DENIED.

## II.  FACTS

Plaintiff Edward T. Kelley alleges that defendant Pemco, his former employer, discriminated against him in violation of the FMLA, 29 U.S.C. § 2601, *et seq*. and the ADA, 42 U.S.C. § 12101, *et seq*. when it terminated him on November 15, 2004, subsequently rehired him, and then terminated him for  a second time on February 11, 2005.  Counts I & II of the amended complaint allege violations of the FMLA and the ADA while Count III alleges a state law breach of contract claim.  The court has jurisdiction of the federal claims alleged in this case under 28 U.S.C. §1331 pursuant to its federal question jurisdiction and supplemental jurisdiction of the state law claim under 28 U.S.C. § 1367.

The facts stated in the light most favorable to the plaintiff are as follows.  Pemco is engaged in the business of aircraft overhaul and modification and employs more than 1,000 workers.

Kelley began working for Pemco in March 1999 as an airplane painter.  In May 1999, plaintiff injured his ankle while at work and was treated by a podiatrist who advised against prolonged standing or walking.

Kelley occasionally missed work to receive treatment for his osteoarthritic ankle condition. Because of his condition, the defendant issued Kelley a placard for his vehicle permitting him to park close to his work area and excused his participation in a practice known as "walking the plane," the name given by Pemco employees to the process used to guide an airplane to another bay.

Labor Relations Manager B.J. Cotton was responsible for overseeing Pemco's Attendance Control Program.  The Attendance Control Program provides that after an employee accumulates five unexcused absences, he is given a written warning.  If the employee continues to acquire written warnings because of unexcused absences, then the employee is eligible for termination after the fourth written warning.  Cotton reviewed employee excuses and made the determination about whether the excuses should be counted as excused or unexcused absences.

Included on the list of excused absences under the defendant's Attendance Control Program are those related to doctors' appointments for "treatment of chronic/recurring illness, i.e., heart disease, cancer, hypertension, pregnancy, etc."  The list expressly provides that excuses for doctor's appointments apply "only to those cases where **continued medical treatment** is necessary to maintain all normal life functions**.  (Not to be used for normal diagnostic doctor visits.) (Proof must be submitted within 48 hours of return to work.)**" (emphasis in original)

Pemco modified its Attendance Control Program in 2003 because of high rates of absenteeism.  A memorandum from Pemco management provided that, effective March 15, 2003,

excuses must be submitted to Pemco within 48 hours of return to work.  The memo also advised employees to "give special attention" to Category 14, relating to absences for doctor visits for chronic/recurring illnesses, and stated that "[a]ny excuse to be considered must state that the absence is due to a chronic/recurring illness and the illness must be identified.  Excuses that are not properly filled out will not be considered."

During 2004, Kelley acquired five unexcused absences and several written warnings and, under the Attendance Control Program, was eligible for termination if he accumulated one additional unexcused absence.  On November 8, 2004, Kelley was absent from work.  When he returned to work on November 9, 2004, Kelley submitted two documents to the defendant's Labor Relations Department.

The first document was a doctor's note from Dr. Steven Sokell indicating that Kelley had been seen by the doctor on November 8, 2004 and was to return to work on November 9, 2004.  No illness was identified in the note and nothing on the face of the note indicated that Kelley's November 8, 2004 absence was related to a chronic illness.

The second document was a Form 380, a Department of Labor form Pemco uses for FMLA certifications.  The Form 380 was dated November 8, 2004, signed by Dr. Steven Sokell, and listed Dr. Sokell's address and telephone number.[1]  The Form 380 indicated, in three separate places, that Kelley was receiving treatment for a chronic or serious health condition involving spurring and osteoarthritis at the ankle joint of the right foot, which began on May 23, 1999.  In answering section 7a of the form, which asked whether medical leave was required for the employee's

---

[1]At the June 5, 2006 hearing, the parties agreed that Court's Ex. 1, presented at the hearing, was the form that plaintiff submitted to Pemco's Human Relations Department on November 9, 2004.  *See* Court's Ex. 1, §3, §5(a) and §5(c).

absence from work because of the employee's own condition, Dr. Sokell indicated that medical leave was required because of foot pain and swelling.

However, Dr. Sokell did not complete three sections of the Form 380. Specifically, Dr. Sokell did not answer block 5B, which requested information about whether the FMLA request was intermittent; block 6A, which asked for an estimate of the probable number of additional treatments needed for the plaintiff's condition; and 7B, which asked whether plaintiff was unable to perform one or more of the essential functions of his job.

The Form 380 does not have a section listing the day or days the particular employee is requesting FMLA leave, and the Form 380 submitted by Dr. Sokell did not reference the plaintiff's November 8, 2004 absence or indicate that it was related to the chronic condition generally described in the form. However, Kelley submitted the Form 380 and Dr. Sokell's note contemporaneously.

Cotton reviewed both the doctor's note and the Form 380 and determined that they did not comply with Pemco's Attendance Control Program requirements. In a November 11, 2004 letter, Cotton informed Kelley that his request for FMLA leave was denied because of Dr. Sokell's failure to answer blocks 5B, 6A, and 7B. Cotton's letter also indicated that, as a result of the November 8, 2004 unexcused absence, Kelley was being suspended pending discharge.

Under Pemco's union contract, Plaintiff was permitted a "24-hour meeting" to present additional information contesting the decision to terminate. Cotton, plaintiff, and two union representatives were present at the meeting. However, Kelley did not present any information in addition to what he previously submitted to Pemco on November 9, 2004.[2] Shortly after the

_____

[2]At some point, Kelley submitted a revised copy of the Form 380 that added the missing information.

meeting, Cotton informed the plaintiff that, because the November 8, 2004 absence was unexcused, he had acquired a fourth written warning and would be terminated effective November 15, 2004.

Three days later on November 18, 2004, Kelley filed an EEOC charge against Pemco alleging that Pemco discriminated against him in violation of the ADA.  Specifically, plaintiff alleged that he was disabled because of his osteoarthritic ankle condition and that his November 15, 2004 termination violated the ADA.  Kelley also filed a complaint with the Department of Labor ("DOL") on January 5, 2005, alleging that Pemco had terminated him in retaliation for his request for FMLA leave.

The EEOC investigated Kelley's claim and recommended that he be reinstated with backpay.  The DOL conducted a similar inquiry.  Sometime in early January 2005, DOL officials met with Cotton who explained that plaintiff was terminated based on the company's nurse's opinion that the remarks contained on his Form 380 were too ambiguous to entitle him to FMLA protection.

The DOL investigators suggested to Cotton that the company reinstate Kelley with lost wages, and then seek clarification for any remaining questions about his FMLA request.  Cotton admitted to the investigators that he should have handled Kelley's termination differently.

Sometime in early January 2005, Pemco and the United Auto Workers, the plaintiff's union, began discussing the possibility of settling grievances between Pemco, Kelley, and another worker who had also been terminated for attendance problems.  Kelley did not directly participate in this process and was represented by union representative B.J. Vandergrift.  On January 21, 2004, Vandergrift asked Kelley to come to the union hall so that he could be reinstated.  Only Vandergrift and Kelley were present at the meeting.  Vandergrift showed Kelley a copy of the unsigned Last Chance Agreement, explaining to him that it contained the terms that Pemco and the union had

6

agreed to during their settlement discussions.

Pursuant to the terms of the proposed LCA, plaintiff would be reinstated to his previous position and receive forty hours back pay.  However, the terms of the agreement provided that Kelley would be immediately terminated if he accumulated any unexcused absences within one year of signing the agreement and that "[a]ll grievances and any other legal protests made by Mr. Kelley are satisfactorily resolved."

After reading and understanding the agreement, Kelley was very unhappy with its terms, especially the portion of the LCA limiting back pay to forty hours.  Plaintiff repeatedly told Vandergrift that the LCA was unacceptable.  However, Vandergrift repeatedly told Kelley that the terms of the LCA would not be changed and that the agreement represented Vandergrift's best effort to resolve the plaintiff's grievance.

Although clearly dissatisfied with the terms of the LCA, Kelley admits that Vandergrift did not tell him that he had to immediately sign the agreement and that he did not ask to discuss the proposed LCA with an attorney.  Kelley also testified that he understood that by signing the agreement, he was resolving all grievances and legal protests relating to his termination. Furthermore, Kelley acknowledged that he could have pursued legal proceedings relating to his disability discrimination and FMLA claims in lieu of signing the agreement.  However, Kelley ultimately decided that he preferred to return to work under the terms contained in the LCA rather than remain unemployed.

Plaintiff signed the LCA on January 21, 2005 and returned to work under its terms on January 24, 2005.  Kelley was absent on January 25, 2005 and January 26, 2006.  He presented doctors' excuses for these absences to Cotton and they were approved by Cotton.  Plaintiff was then absent from work on January 31, 2005 and February 1, 2005.

7

Plaintiff returned to work on February 2, 2005.  In an attempt to have his January 31, 2005 and February 1, 2005 absences excused under Pemco's Attendance Control Policy, Kelley attempted to provide Pemco with an excuse from Dr. Steven Hefter.  However, on February 3, 2005, plaintiff learned that what he thought he submitted to Pemco on January 31, 2005 as a work excuse was actually a prescription.  On the evening of February 3, 2005, less than forty-eight hours after his return to work, Kelley placed the work excuse from Dr. Hefter in Pemco's Labor Relations "drop box."

Dr. Hefter's note indicated that he treated Kelley on January 31, 2005 and that plaintiff was released to return to work on February 2, 2005.  The "Physician's Comments" section of the note indicated: "[plaintiff] off work due to illness (infection-provided per pt's request)."   Because Dr. Hefter's note did not specifically identify the type of infection, Robert Haynes, Pemco's HR Compliance Officer, noted that the excuse was "Denied Not I/AW [in accordance with] Company Policy – Illness not identified.  Does not meet Policy."  Given this determination, Kelley's January 31, 2005 and February 1, 2005 absences were deemed unexcused.  Pemco notified Kelley on February 8, 2005 that Dr. Hefter's February 3, 2005 note did not comply with its attendance control policy and that he was suspended pending discharge.

On February 9, 2005, plaintiff visited Dr. Hefter who subsequently provided him with another doctor's note that Kelley then provided to Cotton during the plaintiff's February 10, 2005 24-hour meeting.  Dr. Hefter's note clarified the nature of the plaintiff's infection, indicating that Kelley "was seen in our office on January 31, 2005, with serious infection and elevated blood count.  He was advised to stay away from work, since he was contagious."

Cotton refused to accept Dr. Hefter's February 9, 2005 note detailing the source of his infection because it was submitted more than forty-eight hours after the plaintiff's February 2, 2005

return to work.  Pemco terminated Plaintiff's employment  for a second time on February 11, 2005.

On March 17, 2005, Kelley filed a second charge of discrimination with the EEOC, claiming he was terminated by Pemco in February 2005 in retaliation for his prior complaints to the EEOC and the DOL.  Plaintiff filed suit in this court on June 1, 2005.

### III. STANDARD OF REVIEW AND DISCUSSION

Summary judgment is an integral part of the Federal Rules of Civil Procedure and allows a trial court to decide cases where no genuine issues of material facts are present.  Fed. R. Civ. P. 56. Disagreement between the parties is not significant unless the disagreement presents a "genuine issue of material fact."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  *See also, Celotex v. Catrett*, 477 U.S. 317, 327 (1986).  A factual dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  *Anderson*, 477 U.S. at 251-52.  In opposing a motion for summary judgment, "a party may not rely on his pleadings to avoid judgment against him."  *Ryan v. Int'l Union of Operating Eng'rs, Local* 675, 794 F.2d 641, 643 (11th Cir.1986).

#### A. Breach of Contract

##### 1. Validity of the Last Chance Agreement

As a threshold matter, the court must address the validity of the LCA before reaching the merits of the plaintiff's FMLA and ADA claims relating to his November 2004 termination.  The Eleventh Circuit has not specifically addressed the validity of last chance agreements waiving an employee's right to federal employment discrimination claims.  Those circuits that have addressed the issue generally hold that employees can, under varying circumstances, waive the enforcement of federal statutory rights in a last chance agreement.  *See Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1184 (6th Cir. 1997) (citing *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974)); *Link v.*

9

*Dep't of the Treasury*, 51 F.3d 1577, 1582 (Fed. Cir. 1995).

However, the decisions from the various circuits that have addressed the validity of the LCA in an employment context vary.  For example, the D.C. Circuit holds that employees can only overcome the waiver of rights if they can show that they did not violate the agreement, that they did not voluntarily and knowingly enter into the agreement, or that the employer breached the agreement.  *Buchanan v. Dep't of Energy*, 247 F.3d 1333, 1338 (Fed. Cir. 2001).  The Sixth Circuit opts for a simpler analysis, determining validity upon whether the employee entered into the agreement voluntarily and knowingly without the existence of overreaching or exploitation; i.e., whether the contract is unconscionable.  *Mararri v. WCI Steel, Inc.*, 130 F.3d 1180, 1184 (6th Cir. 1997) (citing  *Alexander v. Gardner-Denver Co.*, 415 U.S. 36 (1974)).

Given the lack of clear guidance by the Eleventh Circuit and the split of authority among the circuits that have addressed the issue, the court permitted the parties to file supplemental briefs on the issue of whether the LCA agreement was an unconscionable contract that the plaintiff signed under economic duress.[3]

The parties' supplemental briefs analyze this issue under Alabama law.  Under Alabama law, the rescission of a contract based on unconscionability is an "extraordinary remedy usually reserved for the unsophisticated and uneducated."  *Layne v. Layne*, 612 So. 2d 404, 408 (Ala. 1993).  Although Alabama law does not have an express test for determining unconscionability, its courts typically rely on the following factors : (1) whether the plaintiff is unsophisticated or

---

[3]At the June 5, 2006 hearing on the motion for summary judgment, the court dismissed plaintiff's counsel's argument relating to consideration, construing the legally significant issue as one of unequal bargaining power.  *See* June 5, 2006 Tr., p. 20-21.

uneducated; (2) the absence of a meaningful choice; (3) whether the contractual terms are

unreasonably favorable to one party; (4) unequal bargaining power; and (5) the existence of

oppressive, one-sided, or patently unfair terms in the contract.  *Id*.

Furthermore, under Alabama law, economic duress is limited to those situations with

evidence of wrongful acts or threats, financial distress caused by wrongful acts or threats, and the

absence of any reasonable alternative to the terms presented by the wrongdoer.  *Clark v. Liberty

Nat. Life Ins. Co.*, 592 So. 2d 564, 567 (Ala. 1992).  Based on the authority submitted by the

parties, the court will analyze the validity of the LCA under these principles of Alabama law.

Given the undisputed facts of this case, this court simply cannot hold as a matter of law that

the LCA was unconscionable or that the circumstances of its execution were tantamount to

economic duress under Alabama law.  As a preliminary matter, nothing in the record suggests and

plaintiff does not argue that Vandergrift, the union representative, lacked the authority or

experience to negotiate on Kelley's behalf.  Instead, Kelley protests his inability to directly

participate in the negotiation process that resulted in the terms of the LCA agreement at issue in

this case.  However, after an evaluation of the evidence within the requisite standard of review, the

court finds that Vandergrift's involvement in the settlement discussions that ultimately resulted in

the drafting of the LCA undercut any argument that Kelley was so uneducated or unsophisticated to

render the contract unconscionable.

Second, no reasonable juror could conclude that the plaintiff was deprived of a meaningful

choice or that the contract terms unreasonably favored Pemco.  Kelley acknowledged that he could

have pursued legal proceedings relating to his disability discrimination and FMLA claims in lieu of

signing the LCA.  Furthermore, the EEOC's recommendation that the plaintiff be reinstated with

back pay admittedly gave Kelley a substantial amount of additional leverage and a meaningful

11

alternative to signing what he characterizes as an oppressive LCA agreement.

Third, the record contains absolutely no evidence that the contractual terms or the circumstances surrounding the agreement's execution unreasonably favored Pemco.  For example, the LCA does not require that Kelley refrain from acquiring an additional unexcused absence for the duration of his employment, but merely requires that he not incur an unexcused absence for a one year period.  Furthermore, although Kelley complains about not receiving the full amount of back pay, he did receive forty hours of back pay.  Lastly, a reasonable jury could not conclude that the LCA gave Pemco unequal bargaining power or contained oppressive, one-sided, or patently unfair terms in the contract when Kelley acknowledges that he had an opportunity to review the terms of the LCA in a union hall outside the presence of Pemco management, was afforded union representation, and was not prevented from discussing the document with an attorney.

Kelley's arguments related to economic duress essentially boil down to what was an understandably difficult decision and one entered into with reluctance - - whether to relinquish his job and pursue his administrative remedies with the EEOC and the DOL and face continued unemployment or return to a familiar employment situation with Pemco under the terms of the LCA - - but not one tantamount to economic duress.  *See Clark*, 592 So. 2d 564, 567 (Ala. 1992) (holding that the doctrine of economic duress only applies in situations of unjustified coercion or in circumstances where the victim has an absence of meaningful choice).

Based on the foregoing, the court finds that no reasonable juror could conclude that Kelley was pressured into signing the LCA.  Consequently, any FMLA or ADA claims relating to the plaintiff's November 2004 termination are barred pursuant to the terms of the LCA because the plaintiff knowingly and voluntarily waived any federal employment discrimination claims related to his first termination.  Based on the foregoing, the motion for summary judgment is due to be

GRANTED on Counts I and II for any FMLA and ADA claims related to the plaintiff's November 2004 termination.

### 2. Breach of the Last Chance Agreement

In the alternative, Kelley argues that, even assuming the validity of the LCA, Pemco breached the agreement "by unfairly and unreasonably labeling the plaintiff's absences on January 31, 2005 and February 1, 2005 . . . as unexcused so that it could justify terminating his employment." In essence, plaintiff attacks Pemco's ultimate conclusion that Dr. Hefter's February 3, 2005 doctor's note did not adequately identify the specific nature of the infection that resulted in the absences. No one disputes that Pemco's characterization of the note led to Kelley's termination in February 2005.

In its motion for summary judgment, Pemco gives short shrift to the plaintiff's breach of contract claim, arguing that it merits little discussion because of black-letter Alabama law that employees are terminable at will and can be dismissed at any time for "good reason, bad reason, or no reason at all." *See e.g., Salter v. Alfa Ins. Co.,* 561 So. 2d 1050, 1056 (Ala. 1990).

Although the defendant's articulation of the general rule is true, it ignores the terms of the a valid and enforceable LCA agreement in this case - - specifically, the fourth paragraph indicating that Kelley must comply with the terms of the Attendance Control Policy and that the next unexcused infraction will result in discharge.

Consequently, the issue is not the plaintiff's status as an at-will employee, but whether Pemco breached its *duty of good faith* to comply with the terms of the LCA agreement relating to the designation of absences as excused or unexcused. Alabama law clearly recognizes the general rule that every contract implies an obligation of good faith and fair dealing when the parties can point to an identifiable breach. *See Hoffman-La Roche, Inc. v. Campbell,* 512 So. 2d 725, 738

(Ala. 1987).  Although the contractual obligation of good faith and fair dealing exists, its contours have never been specifically defined.  *See Tidmore Oil Co. v. BP Oil Company/Gulf Products Division,* 932 F.2d 1384, 1391 (11th Cir.1991).

Consequently, plaintiff has available a cause of action for the defendant's alleged breach of its duty to in good faith categorize the plaintiff's absences as excused or unexcused. Kelley argues that Pemco breached its duty of good faith by intentionally engaging in a rigid and unduly stringent interpretation of the Attendance Control Policy.  After examining the record within the requisite standard of review, the court concludes that a jury could reasonably conclude that, by unreasonably and unfairly construing Dr. Hefter's February 3, 2005 note, Pemco intentionally breached its duty of good faith, and thus, created a situation where it could terminate Kelley a second time without regard to the viability of any legal claims relating to his first termination.  Consequently, the court finds that the motion for summary judgment is due to be DENIED on the breach of contract claim.

### B. The Family Medical Leave Act

Having concluded that the LCA bars all federal claims related to the plaintiff's November 2004 termination, the court turns to the merits of the plaintiff's FMLA claims relating to his second termination in February 2005.

The FMLA provides an eligible employee up to twelve weeks of leave "because of a serious health condition that makes the employee unable to perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  Although different types of claims are not clearly delineated in the actual language of the FMLA, the Eleventh Circuit holds that the Act establishes a private cause of action for either (1) interference with the exercise of rights provided by the FMLA pursuant to 29 U.S.C. § 2615(a)(1), (2) discrimination against an employee for opposing any

14

practice made unlawful by the FMLA, or (3) interference "with proceedings or inquiries" pursuant to 29 U.S.C. § 2615(b)(1)(2)(3).

### 1. FMLA Interference Claim

As a threshold matter, the court must determine whether the amended complaint alleges a cause of action for FMLA interference.  In its reply brief, Pemco asks the court to prevent the plaintiff from asserting a claim for FMLA interference in connection with his second termination. According to the defendant, at this stage of the proceedings, the plaintiff is precluded from raising a FMLA interference claim not alleged in his amended complaint.  *See Hurlbert v. St. Mary's Health Care System, Inc*., 439 F.3d 1286, 1297 (11th Cir. 2006).  At the June 5, 2006 motion hearing, the court advised the parties that it would permit them to file supplemental briefs regarding whether the amended complaint was sufficient to put the defendant on notice that he was not just seeking recovery for retaliation but recovery for FMLA interference.

After a careful review of the parties' supplemental briefs and the record, the court finds that, even assuming the amended complaint alleges a claim for FMLA interference, Kelley's absences on January 31, 2005 and February 1, 2005 are not FMLA-qualifying absences because they were not related to the treatment of a "serious health condition," as that term is defined under the FMLA.  Because Kelley cannot demonstrate an entitlement to protection under the FMLA, the court concludes that he cannot create a genuine issue of material fact on a FMLA interference claim.

In an interference claim, the plaintiff must show that he or she was "entitled to the benefit denied."  *Rusell v. North Broward Hosp*., 346 F.3d 1335, 1340 (11th Cir. 2003).  To establish a claim of interference under the FMLA, a plaintiff must demonstrate that (1) he is an eligible

employee under the FMLA; (2) the plaintiff is a covered employee under the FMLA; (3) the

plaintiff was entitled to leave under the FMLA; (4) the plaintiff gave appropriate notice to the

defendant of his intention to take leave; and (5) the defendant denied him benefits to which he was

entitled. *Strickland v. Water Works Bd.*, 239 F.3d 1199, 1207 (11th Cir. 2001). At issue, is

Kelley's entitlement to FMLA leave.

To prove entitlement to leave under the FMLA, a plaintiff must present evidence of a

"serious health condition." The FMLA defines the term "serious health condition" as an illness,

injury, impairment, or physical or mental condition that involves inpatient care in a hospital,

hospice, or residential medical facility; or continuing treatment by a health-care provider. 29

U.S.C. § 2611(11).

Kelley did not receive inpatient care at a hospital, hospice, or residential medical facility on

January 31, 2005 or on February 1, 2005. Consequently, to demonstrate that he is entitled to

protection under the FMLA, the plaintiff must demonstrate that his absences on January 31, 2005

and February 1, 2005 were attributable to "continuing treatment by a health care provider."

The Department of Labor implementing regulations define "continuing treatment by a

health care provider" in terms of four types of periods of incapacity: a period of incapacity of more

than three consecutive calendar days and any subsequent treatment or period of incapacity relating

to the same condition, 29 C.F.R. § 825.114(a)(2)(i); a period of incapacity related to pregnancy, or

prenatal care, 29 C.F.R. § 825.114(a)(2)(ii); a period of incapacity for a chronic serious health

condition, 29 C.F.R. § 825.114(a)(2)(iii); a period of incapacity which is permanent or long-term

due to a condition for which treatment may not be effective, 29 C.F.R. § 825.114(a)(2)(iv); and any

period of absence for multiple treatments by a health care provider, 29 C.F.R. § 825.114(a)(2)(iv).

16

Dr. Hefter's note indicates that he treated Kelley once, on January 31, 2005, and advised him to return to work on February 2, 2005.  Nothing in the record indicates that the treatment Kelley received on January 31, 2005 was anything more than a one-time treatment for an infection as opposed to the type of extended treatment or prolonged period of incapacity needed to qualify as a "serious health condition" under the regulations.  The undisputed evidence also indicates that his two-day absence from work falls short of the "more than three consecutive day" standard required under 29 C.F.R. § 825.114(a)(2)(i).[4]  Furthermore, nothing in the record suggests that Kelley could create a genuine issue of material fact on the remaining methods of establishing a period of incapacity under 29 C.F.R. § 825.114(a)(2)(ii-v).

Because plaintiff cannot establish as a matter of law that his absences on January 31, 2005 and February 1, 2005 were attributable to a serious health condition, he cannot demonstrate the requisite entitlement to the statute's protection to sustain a claim for FMLA interference.  Consequently, the defendant's motion for summary judgment is due to be GRANTED on any FMLA interference that may be alleged in Count I of the amended complaint relating to his second termination.

### 2. FMLA Retaliation Claim

Having disposed of Kelley's FMLA interference claim, the court next turns to his claim for FMLA retaliation, one that was clearly alleged in the amended complaint.  Plaintiff argues that he was terminated in February 2005 in retaliation for filing a DOL claim protesting his first

---

[4]The implementing regulations provide that absences attributable to incapacity under paragraphs (a)(2)(ii) or (iii) qualify for FMLA leave even if the absence does not last more than three days. However, nothing in the record indicates that Kelley had a period of incapacity related to pregnancy or for prenatal care to qualify for the exclusion under paragraph (a)(2)(ii) or that he had a period of incapacity due to a chronic serious health condition under paragraph (a)(2)(iii).

termination.

To allege a *prima facie* case of FMLA retaliation, the plaintiff must establish (1) the existence of a right protected under the FMLA; (2) an adverse employment action; and (3) a causal connection between the adverse employment action and the protected activity. *Walker v. Elmore County Bd. Of Educ.,* 379 F.3d 1249, 1252 (11th Cir. 2004) (citing *Strickland v. Water Works & Sewer Bd.,* 239 F.3d 1199, 1207 (11th Cir. 2001)). Because termination is an adverse employment action, at issue in this case are the first and third prongs of the analytical paradigm.

The first element of a FMLA retaliation claim, unlike retaliation under Title VII and similar anti-discrimination statues, requires the plaintiff to prove an underlying entitlement to statute's protection. *See Cash v. Smith,* 231 F.3d 1301, 1306 (11th Cir. 2000) (granting motion for summary judgment on FMLA retaliation claim because plaintiff's medical certification form demonstrated that she could not satisfy the statutory prerequisite for FMLA eligibility); *Morehardt v. Spirit Airlines, Inc.,* 174 F. Supp. 2d 1272, 1279 (M.D. Fla. 2001) (granting motion for summary judgment on FMLA retaliation claim because plaintiff had not worked the required number of hours to entitle her to protection under the FMLA). Given this requirement, the court must examine the merits of plaintiff's November 2004 termination to determine if Kelley had an underlying entitlement to the statute's protection, i.e., whether his absence qualified for FMLA protection.

On November 8, 2004, Kelley was absent from work. The next day, he submitted two documents to the defendant's Labor Relations Department. The first was a doctor's note from Dr. Steven Sokell documenting medical treatment on November 8, 2004. The second document was a Form 380, a form used to request FMLA leave, signed by Dr. Sokell.

18

Although Dr. Sokell did not fully complete the form, the completed portions clearly indicated that he was treating Kelley for a chronic or serious health condition involving spurring and osteoarthritis at the ankle joint.  Dr. Sokell also indicated that Kelley's chronic condition required medical leave.  However, Dr. Sokell did not reference the plaintiff's November 8, 2004 absence or indicate that it was related to the chronic condition generally described in the form. Cotton reviewed both the doctor's note and the Form 380 and determined that they did not comply with Pemco's Attendance Control Program.  Consequently, he deemed the plaintiff's absence unexcused, and he was suspended pending discharge.

Given these facts, Kelley's underlying entitlement to FMLA protection depends upon whether the portions of the Form 380 that Dr. Sokell completed, coupled with the doctor's note, provided Pemco with notice sufficient to trigger its duty to obtain additional information about whether the plaintiff's November 8, 2004 absence qualified for FMLA protection.

In a case like this one where the need for FMLA leave is unforeseeable, the employee must only give such notice as is practicable.  *See* 29 C.F.R. § 825.303(a).  The employee is *not* required to specifically invoke the protections of the FMLA or even mention the FMLA, and the employer bears the burden of determining whether the requested absence actually meets the statutory requirements.  *See Gay v. Gilman Paper Co.,* 125 F.3d 1432, 1436 (11th Cir. 1997); *Norman v. S. Guar. Ins. Co.*, 191 F. Supp. 2d 1321, 1330 (M.D. Ala. 2002).  Instead, the court must look at the facts and circumstances of each case to determine if the employer had notice that the absence was based on a potentially FMLA-qualifying reason.  *See Manuel v. Westlake Polymers Corp.*, 66 F.3d 758 (5th Cir. 1995) (holding that "[w]hat is practicable, both in terms of timing of the notice and its content, will depend upon the facts and circumstances of each individual case.")

Once an employer has notice that the employee's absence is based on a potentially FMLA-qualifying reason, the Eleventh Circuit case law construing the FMLA and its implementing regulations squarely places the burden on the **employer** to resolve any ambiguities related to the request.  *See e.g.*, *Cruz v. Publix Super Markets, Inc.,* 428 F.3d 1379, 1384 (11th Cir. 2005) (once employee adequately conveys to employer sufficient information to put it on notice that absence is potentially FMLA-qualifying, the burden of further inquiry shifts to the employer); *Strickland v. Water Works & Sewer Bd. Of City of Birmingham,* 239 F.3d 1199 (11th Cir. 2001) (interpreting § 825.305(d) and vacating district court's summary judgment for employer where employee had given notice of need for unforeseeable leave sufficient to shift burden of further inquiry to employer as to whether absence truly qualified for FMLA protection).

Furthermore, the FMLA's implementing regulations provide that "[i]n all circumstances, it is the *employer's* responsibility to designate leave, paid or unpaid, as FMLA-qualifying, based on information provided by the employee."  29 C.F.R. § 825.208(a)(2) (emphasis added).  Another implementing regulation provides that "[t]he *employer* will be expected to obtain any additional required information through informal means."  29 C.F.R. § 825.303(a) (emphasis added).[5] Perhaps more forcefully, 29 C.F.R. § 825.305(d) states that an employer must provide the employee with a reasonable opportunity to cure a deficiency in a medical certification.

Based on its evaluation of the record within the relevant standard of review, the court concludes that the plaintiff has created genuine issues of material fact on the issue of sufficient notice of a qualifying FMLA leave.  Specifically, a reasonable jury could conclude that the portions

---

[5] The agency interpretation of the FMLA is persuasive authority because "the well-reasoned views of the agencies implementing a statute constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance."  *Bragdon v. Abbott,* 524 U.S. 624, 642 (1998).

20

of the Form 380 that Dr. Sokell completed clearly indicated that Kelley was receiving treatment for

a chronic or serious health condition involving spurring and osteoarthritis of the ankle joint.

Although Dr. Sokell did not explictedly connect the chronic condition described in the partially-

completed Form 380 to Kelley's November 8, 2004 absence, a reasonable juror could conclude

that Cotton had sufficient notice of the potential connection, given Dr. Sokell's note indicating that

he treated Kelley on November 8, 2004.

Because a jury could reasonably believe that Pemco had notice that the plaintiff's

November 8, 2004 absence might be related to a FMLA-qualifying condition, Pemco had the duty

to request additional information and give Kelley a reasonable opportunity to cure the deficiency.

Given this statutory duty, a reasonable juror could conclude that Pemco's decision to summarily

terminate Kelley, without an attempt to seek clarification from Dr. Sokell or request specific

additional information from plaintiff, divested plaintiff of the statute's underlying protection.

Therefore, the court concludes that the plaintiff has created a genuine issue of material fact

regarding his entitlement to the statute's protection for his November 2004 absence.

The court also concludes that Kelley has created a genuine issue of material fact on the

causal connection prong of the analytical paradigm.  At the June 5, 2006 motion hearing, plaintiff's

counsel clarified that the January 2005 allegation of discrimination reported to DOL investigators,

not the EEOC charge, is the foundation of his FMLA retaliation claim.  With this clarification, the

court opined that the thirty-seven day period between the filing of his DOL complaint and his

second termination supplied the requisite temporal proximity to establish a *prima facie* case.  In

addition to temporal proximity, in early January 2005, DOL investigators met with Cotton

regarding his inappropriate handling of the November FMLA request.  The court concludes that a

reasonable jury could conclude that Cotton was aware that the strict enforcement of Pemco's

Attendance Control Policy might run afoul of the FMLA.  Given this prior knowledge, a juror

could conclude that the decision to terminate Kelley a second time for virtually the same offense

was related to Kelley's decision to file a complaint with the DOL.  Because a reasonable juror

could conclude that the plaintiff's complaint to the DOL and his second termination were not

wholly unrelated, Kelley has established a *prima facie* case of FMLA retaliation.

Once a plaintiff has established a *prima facie* case, the employer then has an opportunity to

articulate a legitimate, non-retaliatory reason for the challenged employment action.  *Pennington v.*

*City of Huntsville*, 261 F.3d 1262, 1266 (11th Cir. 2001).  If the employer presents a legitimate

explanation for its actions, then the burden shifts back to the employee to demonstrate that the

explanation is pretextual.  *Id*.

To determine pretext, the factfinder must determine whether the employer's proffered

reasons for the adverse employment action were "a coverup for a . . . discriminatory purpose."

*Rojas v. Florida,* 285 F.3d 1339, 1342 (11th Cir. 2002) (we are "not in the business of adjudging

whether employment decisions are prudent or fair").  Given this standard, the court must ascertain

whether the plaintiff has cast sufficient doubt on the defendant's proffered nondiscriminatory

reasons to permit a reasonable factfinder to determine that the employer's reasons for the adverse

employment action were not what actually motivated its conduct.  *Silvera v. Orange Cty. Sch. Bd.,*

244 F.3d 1253, 1258 (11th Cir. 2001).

In casting such doubt on the defendant's proffered reasons for discrimination, the plaintiff

must demonstrate "such weaknesses, implausibilities, inconsistencies, incoherencies, or

contradictions in the employer's proffered legitimate reasons for its action that a reasonable

factfinder could find [all of those reasons] unworthy of credence." *Silvera*, 244 F.3d at 1258. (quotation omitted).

As its legitimate non-discriminatory reason for Kelley's termination,[6] Pemco contends that Kelley was terminated on February 11, 2005 because Dr. Hefter's February 3, 2005 note containing the language "[plaintiff] off work due to illness (infection-provided per pt's request)" did not identify the specific type of infection that allegedly caused his absences on January 31, 2005 and February 1, 2005.[7]

After a careful evaluation of the undisputed facts in the light most favorable to the plaintiff, the court concludes that Kelley has created a genuine issue of material fact on the issue of pretext. For example, a juror could reasonably conclude that the events surrounding the DOL's investigation of Kelley's January 5, 2005 complaint casts doubt on the reasons proferred for Kelley's second termination.

The parties agree that DOL investigators told Cotton in early January 2005 that his "zero

---

[6]*See* doc. # 13, p. 29.

[7]Although the court recognizes that Kelley ultimately may have been unable to establish that his absences on January 31, 2005 and February 1, 2005 were attributable to a "serious health condition" under the FMLA or a chronic or recurring condition under Pemco's Attendance Control Policy, the court nevertheless finds a genuine issue of fact as to pretext because Pemco's alleged legitimate, non-retaliatory reason for Kelley's termination **was not** based on a conclusion that the illness attributable to those absences was not related to a "serious health condition" or a chronic or recurring illness under Pemco's Attendance Control Policy, but on alleged deficiencies with Dr. Hefter's February 3, 2005 doctor's note.  *See* Def's Br., doc. # 13, p. 29.

Because of the ambiguity of Hefter's note, Pemco **could not** have known whether the illness resulting in the plaintiff's January 31, 2005 and February 1, 2005 absences would ultimately fall outside the scope of the FMLA.  Given the ambiguity, a reasonable juror could conclude that Pemco had a duty to give Kelley the opportunity to cure these deficiencies prior to unilaterally determining that the absences were outside the scope of the FMLA or the Attendance Control Policy, and failed to do so in retaliation for plaintiff's early complaint.

tolerance" approach to implementing Pemco's Attendance Control Policy might run afoul of the FMLA's statutory requirements.  Consequently, a jury could reasonably conclude that Cotton's reliance on Kelley's technical non-compliance with Pemco's Attendance Control Policy and rejection of Kelley's attempt to cure the deficiencies in Dr. Hefter's original note, merely because they occurred more than forty-eight hours after his January 31, 2005 and February 1, 2005 absences but only one day after he was notified of the note's non-compliance, casts sufficient doubt on the proffered reasons for the discrimination.  Given these findings, the court finds that the plaintiff has created a genuine issue of material fact on the issue of pretext.  Consequently, the defendant's motion for summary judgment on Count I of the amended complaint alleging FMLA retaliation for his second termination is due to be DENIED.

### C. ADA Claim

The court next turns to the plaintiff's alternate claim for relief under the ADA's anti-retaliation provisions.[8]  The ADA provides that "no person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by [the ADA] or because such individual made a charge . . . under [the ADA]." 42 U.S.C. § 12203(a).

To establish a *prima facie* case of ADA retaliation, plaintiff must show that he engaged in statutorily protected conduct;[9] that he suffered an adverse employment action; and that there is a

---

[8]The court does not address the plaintiff's claims for an underlying violation of the statute related to his first termination because of its conclusion that this claim is barred by the LCA.

[9]A plaintiff alleging ADA retaliation does not have to prove an underlying entitlement to the Act's protection.  *See Weeks v. Harden Mfg. Corp.*, 291 F.3d 1307, 1311 -1312 (11th Cir. 2002).  Instead, a plaintiff can establish that he engaged in statutorily protected conduct if he had a good faith, reasonable belief that the employer engaged in unlawful employment practices.  *Little v. United Technologies*, 103 F.3d 956, 960 (11th Cir. 1997).  Consequently, the court need not examine the underlying merits of an ADA claim related to Kelley's first termination.

causal connection exists between his statutorily protected conduct and the adverse employment action at issue in the case.  *Williams v. Motorola, Inc.,* 303 F.3d 1284, 1291 (11th Cir. 2002).

At the June 5, 2006 hearing on the motion for summary judgment, the court questioned the plaintiff's ability to establish a *prima facie* case of retaliation, asking plaintiff's counsel to provide specific evidence of a causal connection between his February 11, 2005 termination and any conduct protected by the ADA.  Specifically, the court had concerns about whether Kelley's November 18, 2004 EEOC charge, filed almost three months (85 days) before his second termination, could establish the requisite casual connection.

In response to these questions about temporal proximity, plaintiff's counsel clarified the precise nature of the retaliation claim, indicating that his January 2005 complaint to the DOL was the statutorily protected conduct forming the basis of his FMLA and ADA retaliation claims. Should the court accept this argument, then the thirty-seven day period between the filing of the DOL complaint and his second termination could conceivably supply the requite temporal proximity to establish a *prima facie* case of retaliation under the ADA.

Upon closer examination of the facts and the relevant case law authority, the court questions whether the plaintiff's complaint to the DOL wage and hour division complaining of violations of the *FMLA* constitute opposition of an act or practice made unlawful *under the ADA*. Despite plaintiff's counsel's urging to the contrary, the court cannot just treat interchangeably complaints involving two very different statutes with very different requirements.  *Cf.*, *Kersting v. Wal-Mart Stores, Inc.,* 250 F.3d 1109, 1117 (7th Cir. 2001) (explaining that the ADA's retaliation provision only prohibits retaliation for opposing or complaining about disability discrimination).  Because Kelley's complaint to the DOL related to the FMLA and not the ADA,

the court cannot rely on Kelley's January 2005 complaint to the DOL to establish the requisite causal connection for his ADA retaliation claim.

Having concluded that the plaintiff cannot use the filing of a DOL complaint to establish the requisite statutorily protected expression to support a claim under the ADA's anti-retaliation provisions, the issue once again becomes whether Kelley's November 18, 2004 EEOC charge, filed almost three months (85 days) before his second termination, establishes sufficient temporal connection to create an issue of fact on the casual connection prong of the statute.

The Eleventh Circuit interprets the causation requirement broadly, indicating that a plaintiff merely has to prove that the protected activity and the negative employment action are not completely unrelated.  *See Olmstead v. Taco Bell Corp.*, 141 F.3d 1457, 1460 (11th Cir. 1998).  Consequently, when determining if a causal connection exists, the court is essentially looking to see if any inference of retaliation can be drawn from the circumstances surrounding the employer's action.  *See Morgan v. City of Jasper,* 959 F.2d 1542, 1547 (11th Cir. 1992).

The general rule in this circuit is that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create a genuine issue of material fact of a causal connection.  *See Brungart v. BellSouth Telecommunications, Inc.,* 231 F.3d 791, 799 (11th Cir. 2000) (recognizing the general rule that close temporal proximity between the employee's protected conduct and the adverse employment action is sufficient circumstantial evidence to create factual issue on causation).  In the Eleventh Circuit, a gap of three months between the protected expression and the adverse employment action is generally insufficient to establish temporal proximity in a retaliation claim.  *See e.g.,*

*Higdon v. Jackson,* 393 F.3d 1211 (11th Cir. 2004).  *See also*, *Meiners v. Univ. of Kan.,* 359 F.3d 1222, 1231 (10th Cir. 2004) (a minimum of two months and one week and a maximum of just under three months between the protected conduct and the adverse action is "probably too far apart . . . to establish causation by temporal proximity alone.").

However, temporal proximity is not the sole means of proving retaliation.  In this circuit, a plaintiff need only prove that the adverse employment action was not wholly unrelated to the protected activity.  *See Olmstead*, 141 F.3d at 1460.  The court specifically finds that a reasonable juror could determine that the filing of the plaintiff's EEOC charge of disability discrimination is not wholly unrelated to his February 2005 termination.  In so holding, the court does not exclusively rely on temporal proximity but on the largely undisputed facts immediately proceeding Kelley's second termination.  For example, between the filing of the EEOC charge and Plaintiff's termination, Cotton was made aware by both the EEOC and DOL of the deficiencies in Pempo's attendance program; Pempo reinstated Kelley at a stringent last chance agreement, and Cotton continued to take a "zero tolerance" approach to implementing Pemco's Attendance Control Policy, without an attempt to cure any deficiencies in the notice.  A reasonable jury could also conclude that Cotton's motive for entering into a LCA agreement was not to rectify what the EEOC concluded was a wrongful termination, but to have another opportunity to terminate Kelley's employment a second time, using essentially the same rationale as the first termination, but with the knowledge that Kelley would be foreclosed from seeking legal relief from any claims related to his first termination.  From these facts and others, a reasonable juror could conclude that  Kelley's termination was not wholly unrelated to his complaints of disability discrimination.

Lastly, the court finds that the strength of the plaintiff's *prima facie* case is sufficient to create a genuine issue of material fact on the issue of pretext. *See Combs v. Plantation Patterns*, 106 F.3d 1519, 1528 (11th Cir. 1997) (holding that evidence of pretext may include the same evidence offered to establish a *prima facie* case). Consequently, the defendant's motion for summary judgment on Count II of the amended complaint alleging ADA retaliation is due to be DENIED.

## IV. CONCLUSION

Based on the foregoing analysis, the court finds that the motion for summary judgment is due to be GRANTED in part and DENIED in part. The court specifically finds that the defendant's motion for summary judgment is due to be GRANTED on Counts I & II for any FMLA and ADA claims related to Kelley's first termination.

The court finds as follows on the plaintiff's claims relating to his second termination. Specifically, that the defendant's motion for summary judgment on Count I of the amended complaint is due to be GRANTED as to any FMLA interference claims related to his second termination. However, the defendant's motion for summary judgment on Counts II & III of the amended complaint challenging the plaintiff's second termination under the anti-retaliation provisions of the FMLA and under state contract law is due to be DENIED.

The court will enter a separate order consistent with this Memorandum Opinion.

DONE and ORDERED this 12th day of December, 2006.

_____
KARON OWEN BOWDRE
UNITED STATES DISTRICT JUDGE